Rockingham County Probate Court
Nos. 99-380
    99-826

ROYAL OAK REALTY TRUST & a.

v.

MORDITA REALTY TRUST & a.

July 2, 2001

*Raymond P. Blanchard, Esq., P.A.*, of Portsmouth (*Raymond P. Blanchard* on the brief and orally), for the plaintiffs.

*Shaines & McEachern, P.A.*, of Portsmouth (*Robert A. Shaines* and *Alec L. McEachern* on the brief, and *Mr. McEachern* orally), for the defendants.

DUGGAN, J. The plaintiffs, Royal Oak Realty Trust (Royal Oak) and Ernest M. and Carole M. Cherry, filed a petition to terminate and dissolve Royal Oak. In these cases consolidated for appeal, the defendants, Mordita Realty Trust (Mordita) and Charles B. and

Beverly P. Mutrie, appeal the Rockingham County Probate Court's (*O'Neill*, J.) order ruling that the Cherrys were entitled to a priority distribution for loans they made to the trust and $100,000 paid to Charles Mutrie. We affirm.

In 1994, Mordita, a realty trust established by Charles Mutrie, and Lone Pine Realty Trust (Lone Pine), a realty trust established by Ernest Cherry, entered into a joint venture agreement (agreement) to complete a real estate development in Raymond known as Onway Lake Village. As part of the agreement, the parties established Royal Oak to acquire and hold the business interest, including the real property. Mordita and Lone Pine each held a fifty-percent beneficial interest in Royal Oak and Ernest Cherry was appointed trustee. The agreement states that the parties would make the following contributions for purposes of the joint venture:

"Cherry"

> 1) $250,000 in direct cash payment to the "Mutrie" Joint Venturer. This payment represents a portional [*sic*] contribution to "Mutrie" in recognition of an agreed upon amount of the current value of the base project value land and approvals of the "Onway Village" Project in Raymond, New Hampshire. However, this does not reflect the net current value of said property and does not give recognition to the fact that there are outstanding real estate taxes against said property. It is agreed between the parties that these taxes will be a charge against the priority payments of business profits realized in the business that would have accrued to the "Mutrie" Joint Venturer. This is to be accounted for by direct payment from "Mutrie" or by an accounting reduction before any "priority distribution" of profits.

> 2) The "Financing" of the joint venture is part of this party's contribution and at the present time it is believed to be estimated at $500,000 direct development funds and the possible payment of up to approximately $330,000 in estimated real estate taxes owing on the existing project. The real estate taxes, again, can be paid by a reduction in the accelerated payout of the profits to the "Mutrie" interest.

> 3) An initial deposit of $50,000 shall be made upon the signing of this Agreement. The remaining $200,000 due under the Agreement shall be due upon the "Cherry" interest being secure in their ability to redeem the past due

taxes from the Town, thereby securing the Business interest's ownership of the land component of this agreement.

"Mutrie"

1) "Mutrie" shall assign to the Royal Oak Realty Trust an existing $3,000,000 mortgage held against the project for purposes of allowing the Royal Oak Realty Trust to foreclose on the property in order to get the property and title free and clear for purposes of developing it in a manner satisfactory to the lender on the project as it is the obligation of this Joint Venturer to deliver a clean title to the property as part of his contribution.

2) In the foreclosure process, if a non Joint Venture bidder bids in excess of $3,000,000 for the property, it is agreed between the parties that this agreement is null and void and the proceeds of the foreclosure auction shall be the property of the "Mutrie" interest. In the event of this occurring, all expenses to date for the foreclosure process shall be borne by the Mutrie interest, which includes preparation and foreclosure expenses and any other expense related to this agreement.

In accordance with the agreement, Ernest Cherry first paid Charles Mutrie the $50,000 due at closing and Charles Mutrie assigned a first mortgage on the premises to Royal Oak. Then, Ernest Cherry paid Charles Mutrie the remaining $200,000. Finally, Royal Oak foreclosed upon the mortgage and purchased the property for $25,000 at auction. After the auction, the only lien remaining on the property was a disputed tax lien of approximately $350,000.

In 1995, the town agreed to extinguish this lien in order to settle a lawsuit that arose during Charles Mutrie's prior ownership of the property. Although this settlement released the property from the tax lien and benefited the current owner, Royal Oak, Charles Mutrie would not receive a direct monetary benefit from the settlement. Charles Mutrie agreed to settle the suit with the town if Ernest Cherry paid Charles Mutrie an additional $100,000.

To finance the project, Ernest and Carole Cherry obtained a bank loan commitment for $900,000 secured by a mortgage on real estate they owned in Massachusetts. These funds were used to complete development and marketing of Onway Lake Village. During the development of the project, the Cherrys issued promissory notes to account for over $1,134,000 in funds advanced by the Cherrys and spent on Royal Oak.

The project never became the financial success the parties expected. After the parties were unable to agree upon their respective rights under the agreement, Ernest Cherry, as trustee of Royal Oak and individually, and Carole Cherry filed a petition to terminate and dissolve the trust. Following a hearing, the probate court found that after Ernest Cherry's initial payments totaling $250,000, the funds the Cherrys advanced to complete the project were loans and not capital contributions. Consequently, upon sale of the property, the court ordered that the loans from the Cherrys to Royal Oak, including the $100,000 payment to Charles Mutrie to clear the tax lien, should be paid before the proceeds are divided between the beneficiaries of Royal Oak.

■ On appeal, the defendants argue the trial court erred by interpreting the agreement to provide that the funds the Cherrys advanced to Royal Oak were loans. "[P]arties in a joint venture stand in the same relationship to each other as partners in a partnership." *Coe v. Watson*, 126 N.H. 456, 458 (1985) (quotation and citation omitted). A joint venture agreement, like a partnership agreement, is a form of contract, *cf. Robbins v. Salem Radiology*, 145 N.H. 415, 417 (2000), and therefore "we will apply the general rules of contract interpretation," *id.* Because "[t]he proper interpretation of a contract is ultimately a question of law for this court," *Benzanson v. Hampshire Meadows Dev. Corp.*, 144 N.H. 298, 306 (1999), "we review the trial court's interpretation of the contract *de novo*," *Keshishian v. CMC Radiologists*, 142 N.H. 168, 177 (1997). "We will sustain the findings and conclusions of the trial court unless they are lacking in evidential support or tainted by error of law." *Miami Subs Corp. v. Murray Family Trust*, 142 N.H. 501, 508 (1997).

"When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." *Id.* "Absent ambiguity, however, the parties' intent will be determined from the plain meaning of the language used in the contract." *Robbins*, 145 N.H. at 418. The defendants argue that the agreement plainly contemplated that the funding used for development was part of Lone Pine's capital contribution. We disagree.

According to the agreement, the purpose of the joint venture was "to acquire and hold the business interest in common and to provide the finances required for its acquisition." The agreement anticipated that the parties would make the following contributions "for the

purpose of this joint venture." "Cherry" was expected to provide: (1) $250,000 in direct cash payment to "Mutrie" as "portional [*sic*] contribution to 'Mutrie' in recognition of an agreed upon amount of the current value of the base project value land and approvals"; and (2) "[f]inancing of the joint venture . . . estimated at $500,000 direct development funds and the possible payment of up to approximately $330,000 in estimated real estate taxes owing on the existing project." The agreement then provides that "'Mutrie' shall experience a priority distribution right of 100% of all profits up to the 'base project value' less the initial $250,000 paid by 'Cherry' and any pre-existing . . . taxes paid and foreclosure expenses paid that are associated with the delivery of a clean title to the Royal Oak Realty Trust . . . ." This "priority distribution is in recognition of the parties [*sic*] attempts to equalize their respective initial contributions from events following the original agreement. ['Cherry' being $250,000; 'Mutrie' being 'base project value']." (Brackets in original.)

■ The defendants assert that this agreement clearly establishes the financing as a contribution, and therefore all funds invested in financing the development are part of Cherry's contribution. Funds provided as part of Cherry's contribution are not entitled to a priority payment. *See generally Miami Subs*, 142 N.H. at 508; RSA 304-A:18, :40 (Supp. 2000). The defendants' interpretation, however, conflicts with a reading of the agreement as a whole. As noted in the paragraph quoted above, the agreement specifically refers to the parties' respective contributions as $250,000 from Cherry and "base project value" from Mutrie. In later paragraphs explicitly referring to the parties' contributions, the word "contribution" only refers to Cherry's direct cash payment of $250,000. Nowhere does the agreement treat the other funds Cherry was to provide for financing as a contribution. Although Cherry also had a specific obligation to secure financing for the project, the agreement plainly indicates that the parties intended to limit Cherry's monetary contribution to $250,000. Therefore, the trial court did not err in finding that "advance[s] made by Cherry after the initial payment of $250,000 to Mutrie were loans to the Trust and not capital contributions to the joint venture."

On March 7, 2001, the defendants notified this court that the property was sold for $950,000. Beyond the $100,000 payment to Charles Mutrie, the trial court specifically found that Royal Oak owes the Cherrys well over $950,000 for loans to the trust. Therefore, the Cherrys are entitled to receive the entire amount

remaining after Royal Oak pays its other liabilities. *See Miami Subs*, 142 N.H. at 508; RSA 304-A:18, :40. Because Royal Oak's assets are insufficient to provide any payment to the defendants, the remaining issues the defendants raise in their brief are moot.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.